# In the United States Court of Federal Claims

BID PROTEST
No. 13-202C
(Filed Under Seal: April 25, 2013)
(Reissued for Publication:  May 10, 2013)[*]
**TO BE PUBLISHED**

|  |  |  |
|---|---|---|
| BEECHCRAFT DEFENSE COMPANY, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Post-Award Bid Protest; Override of the CICA Automatic Stay; 31 U.S.C. § 3553(d); Acquisition of Light Air Support Aircraft for the Afghan Air Force. |
| THE UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| SIERRA NEVADA CORPORATION, | ) ) | |
| Defendant-Intervenor. | ) ) | |

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for plaintiff.  Jerald S. Howe, Joseph J. LoBue, Michael J. Anstett, Aaron T. Tucker, Fried, Frank, Harris, Shriver & Jacobson LLP, Deneen J. Melander, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., of counsel.

J. Hunter Bennett, Trial Attorney, Kirk Manhardt, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

Todd Miller, Holland & Hart LLP, Colorado Springs, Co., for defendant-intervenor.

---

[*] This Opinion and Order was originally filed under seal on April 25, 2013 (docket entry 43) pursuant to the protective order entered on March 22, 2013 (docket entry 22).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a joint status report on May 9, 2013 (docket entry 45).  The Court has reviewed the parties' proposed redactions and concluded that, with certain exceptions, they are appropriate.  Accordingly, the Court is reissuing its Opinion and Order dated April 25, 2013 with redactions indicated by three consecutive asterisks within brackets ([***]).

## OPINION AND ORDER

<u>GEORGE W. MILLER</u>, Judge

On February 27, 2013, plaintiff Beechcraft Defense Company, LLC ("Beechcraft") filed a bid protest with the Government Accountability Office ("GAO"), in which plaintiff asserts that the Department of the Air Force (the "Air Force") improperly awarded a contract for certain aircraft to Sierra Nevada Corporation ("SNC"). Pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3), the Air Force instructed SNC to stay performance while Beechcraft's GAO protest is litigated. The Air Force then decided to override the automatic stay and instructed SNC to resume performance. On March 20, 2013, plaintiff filed a bid protest complaint (docket entry 1) challenging the Air Force's override decision as arbitrary, capricious, and an abuse of discretion.

## I.     Facts

### A.     The Initial Solicitation

The procurement at issue in this case is for the acquisition of light air support ("LAS") aircraft to be provided to the Afghan Air Force ("AAF"). Compl. ¶ 11. As part of its 2014 withdrawal from Afghanistan, the United States has committed to provide LAS aircraft and associated training for the AAF. The LAS aircraft will be used both for training and air-to-ground attack support. AR Tab 5, at 1298. Aerial security enhances ground troop freedom of movement and provides additional reconnaissance and extended attack reach. *Id.* at 1299. The Combined Security Transition Command – Afghanistan originally planned for delivery of LAS aircraft by September 2011. *Id.* The United States is now committed to provide Afghanistan with LAS aircraft beginning in the summer of 2014. *Id.*

The Air Force issued its initial solicitation, No. FA8637-10-R-6000 (the "Initial Solicitation"), on October 29, 2010. *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 739 (2012). At that time, delivery was to begin in April 2013. AR Tab 5, at 1299. The Air Force received proposals in response to the Initial Solicitation from two offerors, Beechcraft (which was known at that time as "Hawker Beechcraft Defense Company, LLC" and has since changed its name) and SNC. *Sierra Nevada Corp.*, 107 Fed. Cl. at 739. On November 1, 2011, the contracting officer issued a decision excluding Beechcraft from the competitive range. *Id.*

Beechcraft filed a bid protest with the GAO, No. B-406170, on November 21, 2011, challenging the Air Force's decision to exclude Beechcraft from the competitive range. *Id.* On December 22, 2011, the GAO dismissed Beechcraft's protest on timeliness grounds. *Id.* The same day, the Air Force awarded contract number FA8637-12-D-6001 (the "Initial Contract") to SNC. *Id.*; *see also* Def.'s Mot. to Dismiss at 2, *Hawker Beechcraft Def. Co. v. United States*, No. 11-897C (Fed. Cl. Mar. 13, 2012).

On December 27, 2011, Beechcraft filed a bid protest action in this court, Case No. 11-897C. 107 Fed. Cl. at 739. On January 4, 2012, the Air Force voluntarily issued a stop-work order to SNC on the Initial Contract. *Id.* at 740. Then, on February 28, 2012, the

United States filed a notice of intent to take corrective action including setting aside the award of the Initial Contract to SNC, reinstating Beechcraft to the competitive range, and accepting new proposals. *Id.* at 742. On March 2, 2012, the Air Force notified SNC that it was terminating the Initial Contract. *Id.* The court dismissed Case No. 11-897C on May 7, 2012. *Id.*

> **B.** *Corrective Action and the Amended Solicitation*

On April 17, 2012, the Air Force met with Beechcraft and SNC to discuss a draft amendment to the Initial Solicitation to request new proposals. *Id.* at 745. The Air Force then issued an amendment to the Initial Solicitation on May 4, 2012. *Id.* at 746. The amended solicitation requires delivery of two aircraft every month beginning July 31, 2014 and continuing through April 2015. AR Tab 1, at 762. On June 12, 2012, SNC filed a bid protest action in this court challenging the Air Force's corrective action and seeking, in effect, to reinstate the Initial Contract. 107 Fed. Cl. at 748. Judge Christine Miller ultimately found that the corrective action was not unreasonable, allowing source selection to proceed on the amended solicitation. *Id.* at 760–61.

On February 27, 2013, the Air Force once again awarded the contract (the "LAS Contract") to SNC. AR Tab 2, at 1072. Plaintiff filed a bid protest with the GAO on March 8, 2013. AR Tab 2.[1] Pursuant to 31 U.S.C. § 3553(d)(3)(A) and FAR 33.104(c)(1), the Air Force directed SNC to stop work on the LAS Contract on March 11, 2013. AR Tab 3. Then, on March 15, 2013, the Air Force notified the GAO and the parties of its decision to override the stay of performance and cancel the stop-work order. AR Tab 12.

The Air Force prepared a Determination and Findings ("D&F") memorandum dated March 15, 2013 in support of its override decision. *See generally* AR Tab 5. The D&F states that the override is "in the best interests of the United States" and that "unusual[2] and compelling circumstances that significantly affect the national security interests of the United States and its coalition partners will not permit waiting for a GAO decision." *Id.* at 1304. The D&F explains that the Air Force cannot wait for the GAO's resolution of Beechcraft's protest because [***].

The D&F describes the LAS aircraft as "indispensable to the operational and strategic success of the [Afghan National Security Forces ("ANSF")]." *Id.* at 1299. Air-to-ground support protects the lives of Afghan ground forces and decreases the risk of poor morale and increased desertion rates. *Id.* Thus, the LAS aircraft is a "key enabler for the ability of the ANSF to maintain security" without the assistance of U.S. troops in Afghanistan. *Id.*

---

[1] Plaintiff filed a supplemental protest with the GAO on March 14, 2013. AR Tab 4.

[2] The D&F uses the phrase "unusual and compelling circumstances" instead of "urgent and compelling circumstances." Defendant suggests that the language may have originated from 10 U.S.C. § 2304(c)(2), which permits sole source procurements upon a showing of "unusual and compelling circumstances." Def.'s Mot. 20 n.2. Whatever the source of the language, it does not appear to affect the substance of the analysis in the D&F.

According to the D&F, the LAS aircraft are already "severely late to need." *Id.*
Under the Initial Contract, delivery was scheduled to begin in April 2013. *Id.*  The D&F
states that the lengthy history of this procurement, including prior litigation and the Air
Force's corrective action, has extended the procurement schedule "to its stretching point."
*Id.* at 1302.  The D&F concludes that the costs of delaying performance—[***]—exceed the
monetary costs that would result if the GAO were to sustain the protest and the Air Force
terminated the contract. *Id.* at 1301.

Plaintiff filed this protest on March 20, 2013.  Plaintiff also filed a motion for
emergency declaratory relief, a temporary restraining order, and/or a preliminary injunction
(docket entry 7, Mar. 20, 2013).  After an initial telephonic status conference with the Court
on March 21, 2013, defendant produced the D&F to plaintiff.  On March 27, 2013, defendant
produced the administrative record ("AR").  Plaintiff filed its motion for judgment on the AR
("Pl.'s Mot.") on April 3, 2013 (docket entry 32).  Defendant filed its cross-motion ("Def.'s
Mot.") on April 10, 2013 (docket entry 37), as did defendant-intervenor (docket entry 40).

Plaintiff also filed a motion to supplement the AR (docket entry 31, Apr. 3, 2013)
with the declaration of Beechcraft's LAS Program Manager, Chris Knaak ("Knaak Decl.").
Defendant responded (docket entry 36, Apr. 10, 2013) that, "rather than opposing
supplementation," it would provide two declarations from Brigadier General Steven Shepro
("Shepro Decl.") and Colonel James G. Fulton ("Fulton Decl.").  During oral argument
defendant moved to supplement the AR with the declarations of General Shepro and Colonel
Fulton.  Defendant-intervenor filed an opposition (docket entry 38, Apr. 10, 2013) to
plaintiff's motion to supplement the AR and also moved to supplement the AR (docket entry
39, Apr. 10, 2013) with a declaration from Silvanus Taco Gilbert, Vice President of
Integrated Tactical Solutions at SNC ("Gilbert Decl.").  On April 16, 2013, plaintiff filed a
reply brief (docket entry 42) in support of its motion to supplement the AR and in opposition
to defendant-intervenor's motion to supplement the AR.

The Court heard oral argument on pending motions on April 19, 2013 and announced
its rulings from the bench.  This Opinion explains the Court's reasoning.

## II.    Analysis

The court has jurisdiction over this bid protest action—including the authority to
grant declaratory or injunctive relief—under the Tucker Act, as amended by the
Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874
(1996).  28 U.S.C. § 1491(b) (granting the Court of Federal Claims jurisdiction to "render
judgment on an action by an interested party objecting to a solicitation by a Federal agency
for bids or proposals for a proposed contract or to a proposed award . . . or any alleged
violation of a statute or regulation in connection with a procurement or a proposed
procurement"); *see also RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1291
(Fed. Cir. 1999) (determining that the Court of Federal Claims may review the merits of an
override independent of any consideration of the merits of the underlying contract award).

"[T]he task of the reviewing court is to apply the appropriate APA standard of review
to the agency decision based *on the record the agency presents to the reviewing court*."

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (emphasis in original) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 726, 743–44 (1985)).  The Federal Circuit has therefore held that the administrative record should only be supplemented in "cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).

"[A] Motion for Judgment on the Administrative Record, pursuant to [Rule] 52.1 [of the Rules of the Court of Federal Claims ("RCFC")], is similar but not identical to a Motion for Summary Judgment, pursuant to RCFC 56."  *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 97–98 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005)).  Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  When considering a motion for judgment on the administrative record, however, the court must weigh the evidence before it; RCFC 52.1 is "designed to provide for a trial on a paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356.

In bid protest cases, the court only sets aside the agency's decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Supreme Foodservice GMBH v. United States*, No. 13-1, slip op. at 10 (Fed. Cl. Mar. 4, 2013); *see* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706.  An agency's decision is arbitrary and capricious if it (1) relied on factors which Congress did not intend it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) was so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

CICA provides for an automatic stay of contract performance while a bid protest is pending before the GAO.  31 U.S.C. § 3553(d)(3).  CICA also authorizes an agency to override the automatic stay and proceed with contract performance upon a written finding that either "performance of the contract is in the best interests of the United States" or "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C).

When reviewing agency decisions to override a CICA stay of performance, courts consider:  (1) "whether significant adverse consequences will necessarily occur if the stay is not overridden"; (2) "whether reasonable alternatives to the override exist that would adequately address the circumstances presented"; (3) "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs"; and (4) "the impact of the override on competition and integrity of the procurement system."  *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 711 (2006); *see also Supreme Foodservice*, slip op. at 14–16; *e-Management Consultants, Inc. v. United States*, 84 Fed. Cl. 1, 4 (2008); *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 189 (2007); *cf. PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 345

(2010) (cautioning against "over-zealously appl[ying] the *Reilly's Wholesale* factors to a CICA stay override decision, [as] such a review could exceed the narrow, highly deferential, 'no rational basis' standard of review," and noting that "[t]he court's focus should be on whether the CICA stay override decision was rational and whether the agency considered relevant factors, not on whether the agency conformed its analysis to [the specific factors set forth in *Reilly's Wholesale*].").

A.   Significant Adverse Consequences

The D&F justifies the Air Force's override decision by describing several adverse consequences that it asserts will occur if the stay is not overridden, including [***]. Additionally, further delay resulting from waiting for the GAO's decision would require a continued U.S. presence to provide air-to-ground capability, which "could easily mean the loss of military and civilian lives." *Id.* at 1300–01.

Plaintiff argues that these consequences need not occur due to alternatives to the override that would allow the Air Force to avoid the consequences cited in the D&F. Pl.'s Mot. 32. As discussed below in section II.B, however, the Air Force reasonably rejected plaintiff's suggested alternatives to the override.

Plaintiff also argues that, because the United States will continue to have *some* role in Afghanistan beyond 2014, there is no need for the AAF to have full air-to-ground capability. *Id.* at 32–33. Plaintiff cites statements from President Obama's State of the Union Address that the United States will continue to train and equip Afghan forces "[b]eyond 2014." *Id.* at 32 (citing AR Tab 14, at 1356). Plaintiff also quotes a Department of Defense report stating that the AAF's "long-term development strategy" is to equip itself to "support the basic needs" of the Afghanistan Government "by 2017." *Id.* at 32 (citing Pl.'s Mot. Ex. 13). Plaintiff contends that these statements demonstrate that the consequences the Air Force describes in the D&F "seem overstated." *Id.* at 33. Plaintiff appears to argue that the AAF will inevitably have *other* capability gaps after 2014, whether or not the AAF has air-to-ground capability, and therefore its need for air-to-ground capability is not as significant as the Air Force contends.

The Air Force's analysis of potential adverse consequences was not arbitrary or capricious. Other ongoing gaps in the capabilities of the AAF do not show that adverse consequences will not result from the lack of air-to-ground capability. In a matter of this nature, the Court defers to the expertise and judgment of the Air Force's analysis of military capabilities. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("We 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986))).

B.   Reasonable Alternatives

The D&F concludes that a continued U.S. presence in Afghanistan is the only alternative source of the required aircraft and associated systems for Afghanistan. AR Tab 5, at 1300–01. According to the D&F, a continued U.S. presence "is not feasible in light of

[***]."  *Id.* at 1301.  Plaintiff argues, however, that the Air Force failed to consider the possibility that the delivery schedule could be condensed as well as improperly rejected the use of Mi-35 or Mi-17 helicopters.  Pl.'s Mot. 11–21.

### 1.  Condensed Schedule

Plaintiff challenges the D&F's statement that "[a]ny delay in contract performance is likely to result in no less than a day-for-day delay in delivery of aircraft."  AR Tab 5, at 1299. Plaintiff asserts that the Air Force failed to consider several steps it could take to expedite delivery.  First, plaintiff argues that the LAS Contract provides the Air Force with two periods of time related to [***] that the Air Force can complete in significantly less time. Pl.'s Mot. 13.  [***].  According to Beechcraft's LAS Program Manager, the [***] can be completed in [***] days.  Knaak Decl. ¶ 12.[3]  Thus, plaintiff characterizes the additional [***] days as a "built-in cushion."  Pl.'s Mot. 13.  [***].

Next, plaintiff argues that SNC can perform the contract more rapidly than the current delivery schedule.  *Id.* at 16.  Plaintiff claims that, if it had been awarded the contract, it could have accelerated its production schedule.  *Id.* at 17.  Additionally, plaintiff notes that SNC's subcontractor, Embraer, has previously produced and delivered aircraft on schedules shorter than the eighteen months provided in the Solicitation and the LAS Contract.  *Id.* at 17–18 (citing Pl.'s Mot. Exs. 4–11).  Finally, plaintiff cites to SNC's public statements that it was "exploring ways to mitigate delays" in response to the stop-work order it received in January 2012.  *Id.* (citing Pl.'s Mot. Ex. 12).

The court's review is limited to examining whether the agency's decision is supported by a rational basis.  *PMTech*, 95 Fed. Cl. at 341.  The court defers to the agency as to its reasonable assessments concerning scheduling risks.  *See Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 258 (2011).  Where the agency has considered and reasonably rejected an alternative, the court will not analyze whether the agency considered every available avenue a plaintiff can imagine for achieving that alternative.  Accordingly, the Air Force need not

---

[3] Plaintiff moved to supplement the AR with Mr. Knaak's declaration.  Defendant does not oppose plaintiff's motion, but defendant-intervenor does.  Mr. Knaak's declaration does not seek to re-examine the agency's fact finding or inferences, but rather seeks to add evidence regarding other allegedly reasonable alternatives.  *See Totolo/King v. United States*, 87 Fed. Cl. 680, 693 n.7 (2009) (allowing supplementation of the AR after noting that "[a] discrete difference exists between adding evidence to the record to aid in the reexamination of the contracting officer's decision and submitting an evidentiary filing that points out to the court whether the contracting officer did or did not do something," because if plaintiff  "can substantiate that the contracting officer's review was insufficient or deficient, [plaintiff] would be supplying the required factual predicate for a finding that the contracting officer acted arbitrarily or capriciously").  Here, Mr. Knaak's declaration is necessary for effective judicial review of the reasonableness of alternatives the agency did not pursue or consider. Plaintiff's motion to supplement the AR with Mr. Knaak's declaration is therefore **GRANTED**.

show that it found each of plaintiff's proposals to be impossible, but only that it rationally considered whether a condensed schedule was possible.

The Air Force's rationale for rejecting efforts to compress the schedule is eminently reasonable.  The D&F explains that delivery is already overdue.  AR Tab 5, at 1299 ("The award date of 27 February 2013 means that delivery to Afghanistan has already been delayed, with the first two aircraft now scheduled 15 months later than the initial date of April 2013 . . . ."); *id.* ("This requirement is already severely late to need.").  Thus, the Air Force is already operating under a compressed schedule.  *Id.* at 1299 ("The time required for the contractor to build, certify, test, ferry, and deliver aircraft is already short.").  Accordingly, the D&F concludes based on schedule constraints that any delay in performance will likely result in delayed delivery.  *Id.* ("Any delay in contract performance is likely to result in no less than a day-for-day delay in delivery of aircraft."); *id.* at 1299–30 ("Due to short contract schedule and disruption associated with delays, if the Air Force stays contract performance, by even as little as 30 days, the contractor's need to stop subcontractor performance and deliveries will delay delivery of aircraft and training at least 30 days and possibly longer.").  [***].  The D&F shows that the Air Force clearly did not, as plaintiff asserts, "entirely fail to consider" a compressed schedule.

Moreover, the Air Force is only required to consider *reasonable* alternatives to the override.  The Knaak declaration fails to establish that any of plaintiff's proffered methods for condensing the schedule are in fact reasonable.  In general, Mr. Knaak's declaration consists of conclusory statements that the schedule can be compressed [***].  *See* Knaak Decl. ¶¶ 7 (stating that Beechcraft could remove [***] time), 12 ("The [***] is arbitrary, unnecessary, and can be reduced significantly.").  Not surprisingly, Colonel Fulton[4] disagrees with Mr. Knaak's assertions.  Fulton Decl. ¶¶ 9–17, 20–24.  Most of the time plaintiff proposes removing from the schedule is attributable to [***].  *Id.* ¶ 24.  There appears to be no reason why Mr. Knaak's understanding of the time needed for [***] would be at all superior to Colonel Fulton's knowledge.  Furthermore, as Colonel Fulton explains, "performance is not just a function of aircraft delivery."  *Id.* ¶ 4.  Therefore, proposals to condense one portion of the schedule do not necessarily have any effect on the overall time for performance.

Additionally, the D&F explains that this is an exceptional case because it is not only the actual delays, but also [***].

---

[4] Defendant submitted a declaration of Colonel James G. Fulton in which Colonel Fulton explains why the delivery schedule could not be condensed and responds to the claims of Mr. Knaak.  Defendant did not originally move to supplement the AR with Colonel Fulton's declaration, but made such a motion during oral argument.  Colonel Fulton's declaration explains why the Air Force did not pursue or consider the alternatives plaintiff and Mr. Knaak propose.  Accordingly, like Mr. Knaak's declaration, Colonel Fulton's declaration is necessary for effective judicial review.  Defendant's motion to supplement the AR with Colonel Fulton's declaration is therefore **GRANTED**.

2.   <u>Mi-35 or Mi-17 Helicopters</u>

The D&F analyzes the viability of using the six Mi-35 helicopters currently in use by the AAF as an alternative to the LAS aircraft:

> [***].  This is not a viable option.  [***].  Based on existing military and political considerations at the national strategic level, provision of LAS aircraft through this contract is the only way, consistent with our commitments, that the U.S. is able to provide to Afghanistan the light attack and surveillance capability it so desperately requires.

AR Tab 5, at 1301.  Plaintiff argues that the record contradicts the Air Force's conclusion that the AAF could not use Mi-35 helicopters as an air-to-ground alternative to LAS aircraft. Pl.'s Mot. 19–21.  Plaintiff notes that five of the AAF's six Mi-35s will remain in service until at least late 2015.  *Id.* at 20.  Plaintiff claims that this would be enough time to account for any delay in performance of the LAS Contract.  *Id.*

The primary flaw in plaintiff's argument is its assumption that six helicopters are a reasonable alternative to twenty planes.  Plaintiff incorrectly attributes to the D&F the conclusion "that the Mi-35s can adequately perform the mission."  *See id.*  The Air Force's reference to the Mi-35 helicopters in the D&F does not imply that the helicopters could effectively replace the LAS aircraft.  *See* AR Tab 5, at 1300–01.  Rather, the D&F addresses whether the Mi-35s ([***]) could be kept in service and rejects this as "not a viable option." *Id.* ([***]).  [***].  In context, it appears that the purpose of the discussion of the Mi-35s in the D&F is to show that without the LAS aircraft, [***].  Accordingly, the Air Force reasonably concluded that use of the Mi-35 helicopters instead of the LAS aircraft is not a reasonable alternative to the override.

Plaintiff also argues that the D&F ignores the option of converting Mi-17s into attack helicopters.  Pl.'s Mot. 20.  Brigadier General Steven Shepro[5]—the Commanding General, NATO Air Training Command Afghanistan and Commander, 438th Expeditionary Wing, Kabul, Afghanistan—explains that the Mi-17s are an even less viable alternative to the LAS aircraft.  First, Mi-17s do not have forward firing capability.  Shepro Decl. ¶ 11.  Second, General Shepro explains that even when the Mi-17s are outfitted with forward firing capability, they fail to satisfy the AAF's air-to-ground support needs.  *Id.* ¶¶ 12–13.  The Mi-17 helicopters are therefore not a reasonable alternative to the LAS aircraft.

C.   *Costs Versus Benefits of the Override*

The D&F demonstrates that the Air Force properly considered the potential costs as compared with the benefits of proceeding with the override.  Paragraph six of the D&F

---

[5] Defendant moved during oral argument to supplement the AR with the declaration of Brigadier General Steven Shepro which explains the deficiencies of the Mi-35 and Mi-17 helicopters.  General Shepro's declaration is necessary for judicial review of the reasons the Air Force did *not* consider the Mi-17s to be a reasonable alternative.  Defendant's motion to supplement the AR with General Shepro's declaration is therefore **GRANTED**.

calculates the estimated costs of termination if the GAO sustains the protest and the contract is terminated one hundred days after award. AR Tab 5, at 1301 ([***]). Paragraph seven explains that the potential costs of not proceeding with the override include [***]. Weighing the costs of not proceeding with the override, the D&F concludes that "[t]he 'cost' of delay is more than a calculation of dollars and cents. In this case, further delay with resulting capability gaps could easily mean the loss of military and civilian lives." *Id.* Plaintiff does not challenge the Air Force's comparison of termination costs to the costs of not proceeding with the override.

> ### D.   Integrity of the Procurement System

In the D&F, the Air Force acknowledges the importance of the CICA stay in protecting the integrity of the procurement system, but the D&F states that this is "an extraordinary case." AR Tab 5, at 1302. The Air Force concludes that, due to the already-tight schedule and the significant effects of this procurement on national security interests, the facts of this case justify the unusual measure of overriding the CICA stay. *Id.* Plaintiff disagrees and argues that the Air Force (1) failed to account for the flaws in the history of the procurement, (2) improperly considered the merits of plaintiff's GAO protest, and (3) used the override as a litigation tactic in support of the Air Force's position before the GAO. Pl.'s Mot. 22.

Plaintiff asserts that the Air Force was required to consider the flawed history of this procurement. Pl.'s Mot. 23. As plaintiff notes, an Air Force Commander Directed Investigation previously found that the Initial Contract procurement was plagued by "issues with documentation of the procurement, inconsistencies in evaluation of the offerors' proposals, and bias exhibited in favor of SNC." 107 Fed. Cl. at 743. Plaintiff cites the Air Force's failure to notify plaintiff of its decisions to exclude plaintiff from consideration and to award the Initial Contract to SNC and the Air Force's alleged failure to include all relevant material in the administrative record during plaintiff's first protest action in this court. Pl.'s Mot. 23–24. While selection and award of the Initial Contract was flawed, the Air Force investigated the initial procurement and responded to the flaws with corrective action, including a new solicitation and source selection conducted by an entirely new source selection evaluation team, contracting officer, source selection advisory council, and source selection authority. AR Tab 5, at 1297. Plaintiff provides no support for its conclusion that the Air Force was required to consider problems with a past iteration of this procurement when considering whether to override the stay.

Plaintiff also argues that the Air Force, in deciding to override the CICA stay, improperly considered its chances of prevailing in the GAO protest. Pl.'s Mot. 25 (citing *e-Management*, 84 Fed. Cl. at 9). The Air Force's "preliminary assessment" was that the "protest grounds have not revealed inadequacies in the source selection process that would give reason to believe that the award decision was not adequately supported." AR Tab 5, at 1303. Such de minimis reference to the merits of the underlying protest is not fatal in this case, unlike the more significant consideration of the merits involved in *e-Management*. In that case, the agency "articulated its optimistic view of the likely outcome of the protest to discount the costs of the override." 84 Fed. Cl. at 9. Here, the D&F considered that the costs of the override are purely financial, but the costs of delay include strained international

relations and possible loss of life—a comparison made on the assumption that the GAO would sustain the protest and the Air Force would terminate the contract with SNC.  AR Tab 5, at 1303 ("That risk is accepted primarily because of the paramount non-monetary national security interests outlined in the above findings, but it is also recognized that failure to provide this capability to Afghanistan as promised will result in non-monetary costs that substantially outweigh projected termination liability.").

Finally, plaintiff argues that the Air Force used its override decision as a litigation tactic to defend against plaintiff's GAO protest.  Pl.'s Mot. 27–31.  The only evidence plaintiff cites to support this argument is a single slide taken from an Air Force briefing presentation entitled "LAS Protest and Override."  AR Tab 17, at 1369.  The slide lists "pros and cons" of the override.  *Id.*  Plaintiff objects to two bullet points found in the "pro" column.  *Id.*  However, neither of these "pros," nor any other indication that the Air Force was using the override as a litigation tactic, appears in the D&F.  Instead, the D&F sets forth a thorough and reasonable explanation for the override decision.

## CONCLUSION

The Air Force properly considered the relevant factors and reasonably determined that the override was supported by urgent and compelling circumstances and was in the best interests of the United States.  Accordingly, plaintiff's motion for judgment on the administrative record (docket entry 32) is **DENIED**, defendant's motion for judgment on the administrative record (docket entry 37) is **GRANTED**, and defendant-intervenor's motion for judgment on the administrative record (docket entry 40) is **GRANTED**.  Plaintiff's motion to supplement the AR with Mr. Knaak's declaration (docket entry 31) is **GRANTED**.  Defendant's oral motion to supplement the AR with the declarations of Colonel Fulton and Brigadier General Shepro is **GRANTED**.  Defendant-intervenor moved to supplement the AR with a declaration from Silvanus Taco Gilbert, Vice President of Integrated Tactical Solutions at SNC (docket entry 39).  The Gilbert declaration is not necessary for effective judicial review.  *See Axiom*, 564 F.3d at 1380.  Defendant-intervenor's motion to supplement the AR with Mr. Gilbert's declaration is accordingly **DENIED**.  Plaintiff's motion for emergency declaratory or injunctive relief (docket entry 7) is also **DENIED**.

The Clerk shall enter judgment in favor of defendant and defendant-intervenor.

Some information contained herein may be considered protected information subject to the protective order (docket entry 22, Mar. 22, 2013) entered in this action.  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted prior to publication in accordance with the terms of the protective order.  The Court **ORDERS** the parties to file a joint status report by **Thursday, May 9, 2013**, identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED**.

 s/ George W. Miller
GEORGE W. MILLER
Judge